UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

BYRON LEWIS BLACK                    )
                                     )
v.                                   )        NO. 3:00-0764
                                     )        JUDGE CAMPBELL
                                     )        DEATH PENALTY CASE
RONALD COLSON, Warden                )
Riverbend Maximum Security Prison

MEMORANDUM

## I. Introduction

This case is before the Court on remand from the Sixth Circuit to reconsider the

Petitioner's claim made pursuant to <u>Atkins v. Virginia</u>, 536 U.S. 304, 122 S.Ct. 2242, 153

L.Ed.2d 335 (2002). <u>Black v. Bell</u>, 664 F.3d 81 (6th Cir. 2011); (Docket No. 134).[1] The Court

heard oral argument on the issue on January 3, 2013. For the reasons set forth herein, the Court

concludes that the Petitioner has failed to carry his burden of demonstrating intellectual

disability[2] by a preponderance of the evidence.

## II. Factual and Procedural Background

In 1989, Petitioner was convicted in Davidson County Criminal Court of three counts of

first degree murder and one count of burglary in connection with the killing of his girlfriend,

Angela Clay, and her two minor daughters, Lakeisha and Latoya. (See <u>State v. Black</u>, 815

_____

[1]  The parties indicate that Riverbend Warden Ronald Colson should be substituted for
Ricky Bell as the Respondent in this case.

[2]  As discussed herein, the term "intellectual disability" has now replaced the term
"mental retardation" for purposes of Petitioner's <u>Atkins</u> claim. Because the evidence in this case
was obtained prior to this change, however, the Court uses the term "mental retardation" in
discussing the evidence.

S.W.2d 166 (Tenn. 1991); Addendum 12). The Petitioner received a death sentence for the murder of Lakeisha, consecutive life sentences for the other two murder convictions, and a fifteen-year sentence for the burglary conviction. Id. Petitioner's convictions and sentence were affirmed on direct appeal, and in state post conviction proceedings. Id. (Black v. State, 1999 WL 195299 (Tenn. Crim. App. April 8, 1999); (Addendum 28).

The facts surrounding Petitioner's convictions were described by the Tennessee Supreme Court in its opinion on direct appeal as follows:

> It appears that these bizarre and tragic murders occurred in the early morning hours of Monday, March 28, 1988. The bodies of the three victims were found Monday evening around 9:30 p.m. At the time of the murders, the Defendant was on weekend furlough from the Metropolitan Workhouse in Davidson County. The Defendant was serving a two-year sentence, after pleading guilty to malicious shooting, a felony.
>
> . . . The Defendant was the boyfriend of Angela Clay, who had separated from her husband, Bennie Clay, about a year before her death. Bennie Clay was the father of Latoya and Lakeisha. Bennie Clay testified that at the time of Angela Clay's death, he and Angela were attempting to reconcile, but the Defendant was an obstacle to the reconciliation. He further testified that Angela began a relationship with the Defendant after their separation and that at times she was seeing both the Defendant and himself. In December, 1986, the Defendant and Bennie Clay had an altercation during a dispute over Angela. As Bennie Clay was returning to his car, the Defendant shot at him. One shot hit the car, another hit Clay in the right foot, and another shot hit him in the back of his left arm. The bullet that went through his left arm lodged under his collar bone. Clay testified that he started running up the street and the Defendant chased him, continuing to shoot. Clay was finally unable to run any farther. He fell down, and the Defendant stood over him and had cocked the gun when Angela Clay ran up to the Defendant and pushed him away. Angela then took Bennie Clay to the hospital, where he remained for seven days. The Defendant pled guilty to the shooting and received the workhouse sentence, which included weekend furloughs.
>
> On Friday afternoon around 5:30 p.m., March 25, 1988, the Defendant was released from the workhouse on a weekend furlough. He returned to the workhouse on the evening of Monday, March 28, at approximately 5:15 p.m. after the murders were committed, but before the bodies were discovered.

2

Angela and her two daughters were last seen Sunday evening around 11 p.m. Angela's sister, Lenette Bell, had borrowed Angela's car on Sunday. Angela was employed at Vanderbilt Hospital, where she worked from 1:30 p.m. to 10 p.m. daily. Lenette Bell arranged to pick up Angela at the hospital at 10 p.m. When Lenette Bell arrived at the hospital, the Defendant was also waiting there for Angela. Angela's children, who were with Lenette Bell while their mother was working, chose to ride with the Defendant and their mother from the hospital. The Defendant drove Angela and her two daughters to the home of Amelia Bell, the mother and grandmother of the victims. Ms. Bell testified that the Defendant left her house in his car, and that her daughter and granddaughters left her house in her daughter's car about 10:20 p.m. Angela returned about 11 p.m. to pick up an iron she had forgotten. That was the last time Ms. Bell saw her daughter alive. Lenette Bell testified that Angela telephoned her at approximately 11:20 p.m. that evening. That was the last time any of the witnesses spoke to the deceased before her untimely death.

When Ms. Bell's daughter failed to return the iron the next morning, she telephoned her daughter but got no answer. She continued to call Angela throughout the day but received no answer. She became concerned and asked another daughter to drive to Angela's apartment. No one answered her knocks at the door. Ms. Bell made other telephone calls to try to locate her daughter and then went to her daughter's apartment with Lenette Bell, but no one responded to their knocks on the door. All the shades were drawn and Angela's car was parked outside of her apartment. It was then they decided to call the police.

The police arrived at approximately 9:30 p.m. on Monday evening, March 28, 1988, and found no signs of forced entry into the apartment; the door was locked. Officer James was able to open a window after prying off a bedroom window screen. All the lights were off. He shined a flashlight into a child's room and saw a pool of blood on the bed and the body of a small child on the floor. He exited the room, and officers secured the scene.

Investigation revealed the bodies of Angela and her nine year old daughter, Latoya, in the master bedroom. Angela, who was lying in the bed, had apparently been shot once in the top of the head as she slept and was rendered unconscious immediately and died within minutes. Dr. Charles Harlan, Chief Medical Examiner for Davidson County, testified that she was probably shot from a distance of six to twelve inches and that her gunshot wound was the type usually caused by a large caliber bullet.

Latoya's body was found partially on the bed and partially off the bed, wedged between the bed and a chest of drawers. She had been shot once through the neck and chest. Blood on her pillow and a bullet hole in the bedding indicated she had been lying on the bed when shot. Dr. Harlan testified that she was shot from a

3

distance of greater than twenty-four inches from the skin surface. The bullet path and type of shot indicated that death was not instantaneous but likely occurred within three to ten minutes after her being shot. Bullet fragments were recovered from her left lung. Both victims were under the bedcovers when they were shot.

The body of Lakeisha, age six, was found in the second bedroom lying facedown on the floor next to her bed. She had been shot twice, once in the chest, once in the pelvic area. Dr. Harlan testified that she had died from bleeding as a result of a gunshot wound to the chest. She was shot from a distance of six to twelve inches and died within five to thirty minutes after being shot.

Abrasions on her arm indicated a bullet had grazed her as she sought to protect herself from the attacker. Bullet holes and blood stains on the bed indicated that she was lying in bed when shot and had moved from the bed to the floor after being shot. There were bloody finger marks down the rail running from the head of the bed to the foot of the bed. The size of the wounds and the absence of bullet casings indicated that a large caliber revolver had been used to kill the victims.

One projectile was collected from the pillow where Latoya was apparently lying at the time she was shot. Fragments of projectiles were collected from the wall above Angela's head; others were collected from the mattress where Lakeisha was found.

The receiver from the kitchen telephone was found in the master bedroom. The telephone from the master bedroom was lying in the hallway between the two bedrooms. The Defendant's fingerprints were the only prints recovered from the telephones. Two of his fingerprints were found on the phone in the hallway, and one was on the kitchen telephone receiver found in the master bedroom.

815 S.W.2d at 170-72.

Pursuant to 28 U.S.C. § 2254, Petitioner filed a Petition seeking habeas relief in this case on August 14, 2000. (Docket No. 1). After appointment of counsel, Petitioner filed an Amended Petition For Writ Of Habeas Corpus (Docket No. 8) raising numerous grounds, including an Eighth and Fourteenth Amendment claim that execution of the Petitioner would be cruel and unusual punishment because he is mentally retarded. The Court subsequently granted summary judgment to Respondent on all claims, including the mental retardation claim, on December 11, 2001. (Docket Nos. 82, 83).

4

The Petitioner filed an appeal, and while the case was pending, the United States Supreme Court issued its decision in Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). In Atkins, the Supreme Court held that executing a mentally retarded person violates the Eighth Amendment's ban on cruel and unusual punishment. The Court did not define the term "mentally retarded," but left to the states "the task of developing appropriate ways to enforce the constitutional restriction" upon their execution of sentences. 122 S.Ct. at 2252.

After Atkins was issued, the Sixth Circuit Court of Appeals held its appeal in this case in abeyance pending a decision by the Tennessee courts on whether Petitioner is mentally retarded. (Docket No. 91). The Petitioner then moved to reopen his state post conviction proceeding to raise the mental retardation claim. Black v. State of Tennessee, 2005 WL 2662577 (Tenn. Crim. App. Oct. 19, 2005). After an evidentiary hearing, the state trial court held that the Petitioner had not demonstrated mental retardation, and that decision was affirmed on appeal by the Tennessee Court of Criminal Appeals. Id. The Tennessee Supreme Court denied Petitioner's application for permission to appeal. Id.

The Sixth Circuit subsequently remanded the case back to this Court for reconsideration of Petitioner's mental retardation claim in this case in light of Atkins. (Docket No. 97). On the first remand, this Court applied the standard of review set forth in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), and held that the Tennessee courts' decisions denying Petitioner's Atkins claim were entitled to deference. (Docket No. 127). The Petitioner appealed that decision to the Sixth Circuit on May 21, 2008. (Docket No. 130).

### III. The Second Remand of Petitioner's *Atkins* Claim

5

On December 15, 2011, the Sixth Circuit issued an opinion vacating the Court's judgment regarding the Atkins claim, and remanding the case for further proceedings consistent with the opinion. Black v. Bell, 664 F.3d at 84.[3]

In considering the Atkins claim, the appeals court pointed out that capital defendants are considered "mentally retarded" if they meet the criteria set forth in Tennessee Code Annotated Section 39-13-203. That statute, which was amended while this case was on appeal to substitute the term "intellectual disability" for "mental retardation,"[4] provides as follows:

> (a) As used in this section, "intellectual disability" means:
>
> > (1) Significantly subaverage general intellectual functioning as evidenced by a functional intelligence quotient (I.Q.) of seventy (70) or below;
> >
> > (2) Deficits in adaptive behavior; and
> >
> > (3) The intellectual disability must have been manifested during the developmental period, or by eighteen (18) years of age.

The statute also provides that the defendant has the burden of demonstrating intellectual disability by a preponderance of the evidence. Tenn. Code Ann. § 39-13-203(c). Black v. Bell, 664 F.3d at 91.

The appeals court summarized the decisions of the state courts applying this statute as follows:

> The state trial court determined that Black's post-conviction *Atkins* claim merited an evidentiary hearing. At this evidentiary hearing, Black had the burden of showing by a preponderance of the evidence that he met Tennessee's definition of

---

[3] The appeals court affirmed the denial of Petitioner's non-Atkins claims. 664 F.3d at 84, 106.

[4] See 2010 Tenn. Pub. Acts 734.

mental retardation under *Atkins*. After the hearing concluded, the court summarized what it viewed as the determinative evidence from the voluminous record and, based on this evidence, denied Black's *Atkins* claim for post-conviction relief.

The TCCA affirmed the trial court's rejection of Black's claim. In its 'Analysis' section, the TCCA mostly reviewed, without taking a stance on, the conflicting expert assessments of the factual record. But the TCCA did recognize that, according to Black's experts, the Flynn Effect and/or the SEM brings his middle set of I.Q. scores into the mentally retarded range. Based on *Howell v. State*, 151 S.W.3d 450, 457 (Tenn.2004), however, the TCCA determined that it was prohibited from considering these scientific concepts in assessing Black's numerical I.Q. score.

The TCCA's assessment of the factual record also makes clear that it was skeptical of the opinions of Drs. Globus and Gur regarding when Black's brain damage occurred. But the TCCA did not go so far as to make a definitive factual conclusion regarding the date of onset of Black's brain damage. The court also discounted Dr. Grant's conclusion that Black displayed deficits in his adaptive behavior because, although Dr. Grant observed that Black had never engaged in a number of commonplace activities, 'there is no proof in the record that [Black] was unable to do these things.' *Black*, 2005 WL 2662577, at *15. It also pointed out that none of Black's childhood I.Q. scores fell in the mentally retarded range. But the TCCA reached its ultimate conclusion that 'the proof in the record simply does not support that [Black's] I.Q. was below seventy or that [Black] had deficits in his adaptive behavior prior to age eighteen' without stating which pieces of evidence were essential to its conclusion. *Id.* at *17.

664 F.3d at 89-90.

The Sixth Circuit ultimately determined that the decisions of the Tennessee courts were not entitled to AEDPA deference because they were at odds with <u>Coleman v. State</u>, 341 S.W.3d 221 (Tenn. 2011), a decision issued by the Tennessee Supreme Court while this case was on appeal, on April 11, 2011. The court determined that unlike the state court decisions in this case, <u>Coleman</u> required the consideration of evidence regarding the impact of the "Flynn Effect," the standard error of measurement ("SEM"), and other factors used by experts in determining a defendant's ultimate I.Q. score. 664 F.3d at 92-97. As to the second criterion, the court

7

determined that the state courts had erred because Coleman required that they "look at his weaknesses instead of at his strengths," and because they failed to consider the potential relationship between mental illness and mental retardation in assessing the Petitioner's deficits in adaptive behavior. 664 F.3d at 97-100. Consequently, the court concluded that an independent, de novo review of the record is appropriate. 664 F.3d at 97, 100-01. In a dissent, Judge Boggs determined that remand was inappropriate, and that the Petitioner should seek to re-open his prior post conviction proceeding based on the Coleman decision. 664 F.3d at 107-08.[5]

This Court subsequently considered Petitioner's request to introduce new evidence, and denied the request based on the language of the Sixth Circuit's opinion directing the Court to "review the record based on the standard set out in *Coleman*. . ." (Docket No. 150, at 2).

<u>IV. De Novo Review</u>

As directed by the appeals court, this Court undertakes a de novo review of the evidence admitted at the post conviction proceeding in state court to determine whether the Petitioner has satisfied the three statutory criteria. That record includes the testimony of Mary Smithson-Craighead, a teacher; Melba Faye Corley, the Petitioner's sister; Al Dennis, the Petitioner's high school football coach; Richard Corley, the Petitioner's brother-in-law; Petitioner's experts Dr. Albert Globus, Dr. Daniel Grant, and Dr. Ruben C. Gur (by deposition); and the State's experts Dr. Eric S. Engum and Dr. Susan Vaught. (Docket No. 106 (Addendum 30-31)). The record also

---

[5] In a more recent decision, Keen v. State, ___ S.W.3d ___, ___ n. 13, 2012 WL 6631245 (Tenn. Dec. 20, 2012), the Tennessee Supreme Court held that Coleman did not establish a new constitutional right to be applied retroactively, and noted its agreement with Judge Boggs that "'*Coleman* decided how a Tennessee state statute should apply to a Tennessee state court opinion [i.e., *Van Tran*] decided under the Tennessee state Constitution.'" (quoting Black v. Bell, 644 F.3d at 107-08 (Boggs, J., dissenting)).

8

includes the affidavits of Dr. Patti van Eys, James Lawler, Ph. D. and Michael Nash, Ph. D. (Docket No. 106 (Addendum 29, Volume 2 of 3)), and a number of other exhibits, including the experts' reports, the Petitioner's school records, medical records and prison records, and testimony from the Petitioner's trial and first post conviction hearing. (Docket No. 106 (Addendum 30)).

As set forth above, in order to demonstrate that he is "intellectually disabled" under Tennessee Code Annotated Section 39-13-203(a), the Petitioner has the burden of demonstrating the following criteria by a preponderance of the evidence:

(1) Significantly subaverage general intellectual functioning as evidenced by a functional intelligence quotient (I.Q.) of seventy (70) or below;

(2) Deficits in adaptive behavior; and

(3) The intellectual disability must have been manifested during the developmental period, or by eighteen (18) years of age.

The statute requires that all three criteria be met in order to establish "intellectual disability." State v. Strode, 232 S.W.3d 1, 18, 2007 WL 2316355 (Tenn. 2007).

The record indicates that the Petitioner was born on March 23, 1956, and was 33 years old at the time the crimes were committed in 1988. Black v. Bell, 664 F.3d at 84. The Petitioner was approximately 48 years old when the state court proceedings on mental retardation were held in 2004. (Docket No. 106)(Addendum 29-31)).

A. IQ of 70 or below prior to age 18

Efficiency and logic suggest that, in this case, the Court consider the first criterion in conjunction with the third. Accordingly, the Court will first review the record to determine whether the Petitioner has shown: "Significantly subaverage general intellectual functioning as

9

evidenced by a functional intelligence quotient (I.Q.) of seventy (70) or below, . . . manifested during the developmental period, or by eighteen (18) years of age." Tenn. Code Ann. § 39-13-203(a)(1), (3).

In the state post conviction proceeding on the issue of mental retardation, the parties introduced evidence of various IQ tests taken by the Petitioner over his lifetime. The Petitioner's school records indicate that prior to age 18, he scored as follows:

| Date of test | Name of test | Score | Petitioner's Approximate Age |
|---|---|---|---|
| 1963 | Lorge Thorndyke | 83 | 7 |
| 1964 | Unknown | 97 | 8 |
| 1966 | Lorge Thorndyke | 92 | 10 |
| 1967 | Otis | 91 | 11 |
| 1969 | Lorge Thorndyke | 83 | 13 |

(Docket No. 106 (Addendum 30, Vol. 1, at 233 (testimony by Dr. Grant); Exhibit 1, Exhibit 36)).

Prior to his trial in 1989, the Petitioner's attorneys retained mental health experts to evaluate him for competency and sanity. At that time, the Petitioner scored as follows:

| Date of test | Name of test | Administered by | Score | Pet's Approx. Age |
|---|---|---|---|---|
| 1989 | Shipley-Hartford | Dr. Kenneth Anchor/ Dr. Pat Jaros | 76 | 33 |

(Id. (Addendum 30, Exhibit 4, at 5-7, 11; Exhibit 25, at 2308-09)).

During the first state post conviction proceeding, Petitioner's counsel retained different mental health experts to evaluate his mental status. At that time, the Petitioner scored as follows:

| Date of test | Name of test | Administered by | Score | Pet's Approx. Age |
|---|---|---|---|---|
| 1993 | WAIS-R | Dr. Gillian Blair | 73 | 37 |
| 1997 | WAIS-R | Dr. Pamela Auble | 76 | 41 |

(Id., (Addendum 30, Exhibits 15, 16, 33, 34, 36)).

During the initial habeas proceeding in this Court, still other mental health experts

10

evaluated the Petitioner.  At that time, the Petitioner scored as follows:

| Date of test | Name of test | Administered by | Score | Pet's Approx. Age |
|---|---|---|---|---|
| 2001 | WAIS-III | Dr. Patti van Eys | 69 | 45 |
| 2001 | Stanford-Binet-IV | Dr. Daniel Grant | 57 | 45 |

(Id. (Addendum 30, Exhibits 10, 41)).

In summary, the Petitioner did not score 70 or below on an IQ test until 2001, when he was approximately 45 years old.  The Petitioner argues that the test scores prior to that date are invalid, or the scores should be adjusted downward for various reasons.  As for the IQ tests administered during his years in school, the Petitioner argues that those tests should not be considered at all because they were group-administered tests, which are less reliable than individually-administered IQ tests. Indeed, the experts on both sides indicated that testing an individual one-on-one was the preferred method for measuring IQ. (Docket No. 106 (Addendum 30, Vol. 2, at 234-236, 300, 372-73)).  There is no support in the record, however, for completely disregarding all group-administered tests.  Instead, the group setting goes to the "weight" to be given the test score.  As Dr. Engum explained:

> Q.     What significance, if any, do you place on the tests scores administered, and tests scores he received when he was in school?  Are those to be considered?
>
> A.     Oh, absolutely.
>
> Q.     Or how much weight, if any, do you give those?
>
> A.     I think they're (sic) two answers to your question.  Number 1, I fully agree with Dr. Grant, that group administered IQ test[s] are not as accurate as individually administered IQ test[s].  That is, they have a greater standard error of measurement.  On the other hand, they're utilized in a number of settings to determine how children are functioning. . . You might say the standard error of measurement on the Wechsler Adult Intelligence Skill, Third

> Edition, is plus or minus five points, roughly. On a group
> administered IQ test, it may be plus or minor (sic) eight points. So
> it's not as accurate. The place where you really get into some
> question is, if you have a group administered IQ test let's say, 73,
> then I wouldn't make a diagnosis of borderline versus mental
> retardation on that score. I would send him out for further testing.
> But where the test scores are substantially higher, I don't see that
> there's any reason to suspect that he was mentally retarded; and, in
> fact, the school authorities did not see him in that way.

(Id., at 372-74). Applying the eight-point SEM suggested by Dr. Engum to reduce the

Petitioner's IQ scores prior to age 18 results in a range from 75 to 89, still comfortably above the

statutory criteria of 70 or below.

The Petitioner also argues that the school test scores should be discounted because the

Petitioner was in a low-performing school, and that the teachers were under pressure to inflate

the test scores. Petitioner bases this argument on the testimony of Mary Smithson-Craighead,

who taught at Head School in Nashville from 1953 to 1965, when she became the coordinator of

the Nashville Educational Improvement Project. (Docket No. 106 (Addendum 30, Vol. 1, at 24-

25)). At that time, Ms. Smithson-Craighead moved to Carter Lawrence, the Petitioner's school,

for two years, where she supervised kindergarten through third grade, but was not one of the

Petitioner's teachers. (Id., at 26, 31-33, 53-54). According to Ms. Smithson-Craighead, Carter

Lawrence was a segregated school and one of the schools that needed the most help. (Id.) She

made the following statement about standardized testing:

> Q.    And what were your observations of the way that standard tests were
>        given?
>
> A.    They were given, by the greater part, they were given exactly by
>        direction. But being human, teachers who had, if they've been
>        working with a child during the year, and that child was doing all
>        that he or she could do; the teacher, when they tested that child
>        may come around and say, well, take so-and-so, and give him a

12

> little bit of extra help. Just because they like the child. And they
> realized a child had been doing all that he or she could do. And
> they'd be, well, do so-and-so, which was really against the
> directions of the test. It simply, really, made the testing invalid,
> but the test goes on with a group of tests. And that's it.

(Id., at 37). Ms. Smithson-Craighead later testified that the IQ tests given at the school were

administered individually by a psychologist from the District Office, but the experts who

testified opined that she was mistaken about that. (Id., at 49-51, 234).

The Court is not persuaded that this testimony warrants the discounting of Petitioner's

school test scores. Ms. Smithson-Craighead's testimony does not include any time frame for the

incidents she described, nor any specific information regarding the names of the teachers

involved, the grade level of the classes involved, or whether she was referring to an achievement

test, an IQ test, or some other test. Certainly, her testimony does not support the conclusion,

apparently accepted by some of Petitioner's experts, that the *Petitioner's* scores were inflated on

each of his IQ tests because his teachers helped him choose the correct answers. As for the

performance level of the school, as Dr. Engum pointed out, the scores reflect a comparison of

children across the country and is independent of the school system. (Docket No. 106

(Addendum 30, vol. 2, at 410-11, 422-23)).

Petitioner's experts also questioned the reliability of the school test scores by pointing

out that the Petitioner failed the second grade, and the results would be skewed upward if the

Petitioner's answers were compared with younger children in the same grade. (Id., at 301-02;

335-37). But there is no evidence that the tests were scored by grade rather than age. (Id., at

417). Even so, Dr. Vaught testified that the results would not be dramatic because there would

only be a year's difference in the comparison. (Docket No. 106 (Addendum 30, vol. 3, at 637,

639)).

Weighing against the Petitioner's arguments for reductions of his school test scores is the expert testimony that IQ tests tended to underestimate the intelligence of African American children in the 1960s. (Id., vol. 1, at 309, 369; vol. 3, at 537-38). According to Dr. Vaught, this cultural bias "was one of the reasons why that diagnostic criterion was changed back in the '70s, from one standard deviations (sic) to two standard deviations below the mean." (Id., vol. 3, at 537).

Petitioner argues that his later scores, from 1993 and 1997, should be adjusted downward based on the "Flynn Effect." Dr. Grant explained that the Flynn Effect recognizes that after an IQ test is released it begins to age because the general population's level of knowledge increases over time, such that for every three years after the test is released, the norm IQ is inflated by one point. (Docket No. 106 (Addendum 30, vol. 1, at 239-45)). Based on this research, Dr. Grant deducted four points from the Petitioner's test score of 73 in 1993 and arrived at a score of 69; and deducted five points from Petitioner's score of 76 in 1997 for a score of 71. (Id., at 243-44). Dr. Grant did not use this theory to reduce the school IQ scores obtained from 1963 to 1969 before the Petitioner reached age 18. (Id., vol. 2, at 324). Dr. Grant relied on several articles to support his conclusion. (Id., at 239-42; vol. 2, at 322-27).

To support application of the Flynn Effect, the Petitioner also filed an affidavit of Dr. Patti van Eys, which stated that the Flynn Effect is broadly accepted by the psychological community, but unlike Dr. Grant, she did not rely on that concept to retroactively reduce the Petitioner's test scores. (Docket No. 106 (Addendum 29)). Indeed, Dr. Engum and Dr. Vaught testified that, while the Flynn Effect supports the need to re-norm an IQ test over time, and is

14

something to be considered in reviewing a person's test scores, there is no scientific support for retroactively reducing a particular test score based on the Flynn Effect. (Id., at 374-76, 446-49, 462-68; vol. 3, at 538-39; 599-605). As Dr. Vaught explained:

> I'm aware of the Flynn Effect, and I think most people are aware of that effect. However, it's not standard of practice to correct for it, in terms of looking at an IQ score. Again, you're aware of it. What the standard of practices (sic) to deal with the standard error of measurement on the instrument, which is the likelihood of a person getting a score within a certain range, the next time you administer it. That's the correction most people are willing to use. And that's the one in common usage among clinicians who do this for a living.

(Id., at 538-39).

The Court notes that the experts who administered the tests in 1993 and 1997 did not reduce the Petitioner's scores based on the Flynn Effect in light of the age of the tests they administered. In addition, the articles relied on by Dr. Grant describing the Flynn Effect do not appear to suggest the reduction of individual test scores as a scientifically valid remedy. (Docket No. 106 (Addendum 30 - Exhibit 11)).

Nevertheless, the Court will consider Dr. Grant's reduction of individual test scores based on the Flynn Effect. Dr. Grant applied that reduction only to test scores from 1993 and 1997, however, which were obtained when the Petitioner was 37 and 41 years old, respectively. The six test scores obtained prior to that time were not at or below 70. Thus, application of the Flynn Effect in this case provides weak support for the statutory requirement that the Petitioner have scores at or below 70 before he turned age 18.

The Petitioner also argues that the standard error of measurement should be applied to reduce Petitioner's test scores. Indeed, there was support from the experts on both sides for considering the SEM in reviewing test scores. (Docket No. 106 (Addendum 30, vol. 1, at 231-33;

15

vol. 3, at 538-39)). The SEM is applied in recognition of the fact that the test is not perfect, and according to Dr. Grant, the SEM for IQ tests is from one to five points, depending on the test. (Id., vol. 1, at 231-32). The Court notes, however, that the SEM does not require that test scores only be reduced, nor does it require that five points be used for every test. (Id., vol. 2, at 431). In any event, even if the Court applies an SEM of eight points to reduce all of the Petitioner's test scores in school, as discussed above, the lowest score would be 75. Although applying the SEM to reduce Petitioner's later scores may bring him closer to the statutory criteria, those scores provide weak support for the proposition that the Petitioner had scores at or below 70 before he turned age 18.

The Sixth Circuit criticized the state courts for failing to resolve "which set of scores most accurately reflects Black's level of intelligence by the time he was 18 years of age." 664 F.3d at 87. This Court has fully reviewed the record in this case, has fully considered the "Flynn Effect," the SEM, and other factors weighing on the accuracy of the test scores, and for the reasons set forth above, specifically finds that the tests taken by the Petitioner in school[6] most accurately reflect the Petitioner's level of intelligence by the time he was 18 years of age.

Petitioner also argues that the results of his brain scans showing an abnormal brain further support the contention that he satisfied the statutory criteria by age 18. As a result of sophisticated imaging of the Petitioner's brain, Dr. Gur testified that the Petitioner had abnormally enlarged ventricles. (Docket No. 106 (Addendum 31, at 48-52, 60-61)). According to Dr. Gur, this damage would affect a person's ability to control aggression and to consider the

---

[6] As set forth above, those tests were taken from 1963 to 1969, and produced scores ranging from 83 to 97.

16

outcome of his or her actions. (Id., at 72-73). Because of that brain damage, Dr. Gur opined that the Petitioner was mentally retarded, though he admitted that he is not an expert in mental retardation. (Id., at 102-03, 105-06). As to the cause of the brain damage, Dr. Gur testified that the damage would be consistent with that experienced by children whose mothers abused alcohol during pregnancy. (Id., at 99-102). Dr. Gur also opined, however, that the damage could also be caused by alcoholism in adults, lead poisoning, head injuries from football, and other conditions. (Id., at 105, 113-16). In discussing possible causes, he testified:

> Q.    So just looking at all these possible causes along with your probable cause, there's really no way to say exactly what has caused the brain damage that you're saying that Mr. Black has with your findings?
>
> A.    Really, there isn't. I –
>
> Q.    Now, another kind of similar but – as far as timing, again your probable cause is maybe the fetal alcohol syndrome or lead poisoning, or something, he fell down, or ate dirt. You know, a lot of different things were mentioned in these reports that possibly could have caused some brain damage.
>
> A.    Uh-huh.
>
> Q.    But again, with timing, is there any way to tell exactly what time in his life that this happened?
>
> A.    No. The only –
>
> Q.    I'm sorry. Go ahead, Doctor.
>
> A.    What you can say is that this kind of a brain doesn't happen overnight. . .

(Id., at 116). Dr. Gur later testified that he would "absolutely agree" that he could not determine whether someone is mentally retarded simply by looking at the brain scans alone. (Id., at 122-23).

Dr. Globus also opined that Petitioner's brain damage was possibly caused by the

17

Petitioner's mother's consumption of alcohol during pregnancy, playing football, or lead poisoning. (Id., at 159-62; 259-62; 265-66). Dr. Globus admitted, however, that the brain scans do not reveal the cause of the brain damage. (Id., at 274). In determining whether the brain injury could have resulted from a deficiency in adulthood, Dr. Globus testified that "there's a rule of medicine, that you take the simplest explanation that fits the facts." (Id., at 275).[7]

Although Dr. Gur and Dr. Globus relied on the "fact" that the Petitioner's mother drank during her pregnancy, they did not cite to the particular information upon which they relied. The Court has reviewed the record of the post conviction hearing on the issue of mental retardation for evidence about alcohol consumption by the Petitioner's mother during pregnancy. That topic was discussed by Petitioner's aunt, Alberta Crawford, during her testimony in the first post conviction proceeding. (Docket No. 106 (Addendum 30 - Exhibit 22)). Ms. Crawford testified that she is 13 years younger than the Petitioner's mother, Julia, who was 34 when she was pregnant with the Petitioner. (Id., at 526). Ms. Crawford testified that she and Julia "occasionally" went out and drank alcoholic beverages, specifically scotch. (Id., at 527). As for drinking while she was pregnant, Ms. Crawford testified:

> Q.  Okay. Did your sister's drinking patterns ever change during the period of time she was pregnant?
>
> A.  That I can't remember.
>
> Q.  Did she ever stop drinking and say, I'm pregnant, I can't drink? Do you recall that at all?

---

[7]  Dr. Globus also testified that his opinion was based on Petitioner's lack of exposure to other potential causes after his arrest and incarceration. (Id., at 188-89). He did not discuss the 13 to 14-year time span between the time the Petitioner turned 18 and the time of his arrest and incarceration.

A.      I can't recall that, either.  Because I wasn't around her, you know, after I
        got to be in high school and out of high school I wasn't with her all the
        time.  So I really don't know.

Q.      Well, after you were out of high school, though, you still continued to go
        socialize with her, correct?

A.      Not all the time.  Like I said, I wanted to go to a nightclub and I chose her to carry
        me because I didn't have anybody else to carry me.  And I wanted to go to the
        ball park to see my brother play ball and I would go with her.  Not just by herself.
        It was other people too.

(Id., at 528-29).

Petitioner's sister, Melba Faye Corley, who was approximately seven years old when her

mother was pregnant with the Petitioner, testified about her mother's drinking:

Q.      What do you remember about your mother and her drinking of alcoholic
        beverages?

A.      Well, she was a member of like a little social club, and they would
        have like little dances and things.  And they would get together
        and fix food, and they would have their own BYOB's, Bring Your
        Own Bottle, but it wasn't every month like that.

Q.      Okay.  Do you know if she changed this behavior during – you were in the
        household when your mother was pregnant with both, your brother, Byron Black,
        and also with your sister, Frieda Black correct?

A.      Correct.

Q.      Do you remember anything about your mother's drinking when she was
        pregnant?

A.      She still drank, but I don't think it was ever stopped.

(Docket No. 106 (Addendum 30, vol. 1, at 80-81)).

Petitioner's uncle, Finas Black, was also questioned about the subject at the state post

conviction hearing. (Docket No. 106 (Addendum 30 - Exhibit 38)). Mr. Black testified that he

was one of ten siblings of the Petitioner's mother, Julia, and that he was twenty, twenty-five or

19

thirty years younger than Julia. (Id., at 513, 515). He also testified that he was about eight or nine when the Petitioner was born. (Id., at 516). Mr. Black said that he recalled Julia drinking "multiple drinks" of scotch "mostly on the weekends." (Id., at 518-19). He went on to testify:

> Q.     And when – to your recollection or do you know whether or not your sister Julia Mae stopped drinking during when she was pregnant either with Byron or with Frieda [Petitioner's younger sister]?
>
> A.     No, I wouldn't say so.
>
> Q.     You would say she didn't.
>
> A.     Right. She didn't.
>
> Q.     And do you know whether or not she breast-fed Byron for a while after he was born?
>
> A.     Yes, she did.
>
> Q.     Did she stop drinking during that period of time?
>
> A.     No, I wouldn't think so.
>
> Q.     And your sister Julia Mae was sort of known as a partier, is that a fair statement?
>
> A.     Yes, yeah.

(Id., at 519-20).

The testimony of Petitioner's mother, Julia Black, from the trial was admitted as an exhibit, but the question of whether she drank while pregnant with the Petitioner was not addressed during her testimony. (Docket No. 106 (Addendum 30 - Exhibit 15)).

To the extent Dr. Gur and Dr. Globus based their opinion of Fetal Alcohol Syndrome or Fetal Alcohol Effects on the testimony of adults recalling events that took place when they were seven to nine years old, their opinions regarding the cause of Petitioner's brain damage are not particularly persuasive. Dr. Engum's testimony pointed to the conjecture underlying these

20

opinions:

> Q. And you believe, of course, that some of that analysis of people like Dr. Globus, who's a neurologist and Dr. Gur, who does brain imaging?
>
> A. Right. But everybody's speculating about how much alcohol the mother drank. And I don't think that we really know that. I don't know. And I understand the mother is now deceased.
>
> Q. But we do have proof from witnesses that have testified, at the various parts of this case, that she drank weekends; she didn't stop during pregnancy.
>
> A. I've seen that testimony. Again, I will just tell you, there are some people that tend to minimize her alcohol consumption. There are some people who seek to maximize it. I don't know how much she drank. It's in the realm of conjecture.

(Docket No. 106 (Addendum 30, vol. 2, at 475-76)).

Also weighing against the opinion that Petitioner's brain was damaged at birth is the absence of medical records from Petitioner's pediatricians at Vanderbilt University Hospital revealing developmental concerns. (Docket No. 106 (Addendum 30 - Exhibits 7, 36)). Dr. Vaught testified that the "typical developmental impairments that you would see from Fetal Alcohol Effects or Fetal Alcohol Syndrome, apparently, were not present in this individual. He didn't have the milestone failures or be identified (sic) by his pediatricians as standing out like that." (Docket No. 106 (Addendum 30, vol. 3, at 625-26)).

Indeed, the Petitioner was not diagnosed as having mental retardation until he was 45 years of age, in 2001, as part of this litigation, though he was evaluated by numerous experts before that time. Dr. Kenneth Anchor, who was hired by the defense before the trial in 1989, testified that the Petitioner scored a 76 IQ, and opined that he suffered from a delusional disorder and was not competent to stand trial. (Docket No. 106 (Addendum 30, Exhibits 4 and 5)). Dr. Leonard Morgan and Dr. Bradley Diner testified that the Petitioner was competent, that he was

21

at the lower end or the normal intelligence range, but not mentally retarded, and that he may

have a personality disorder. (Id., at Exhibits 6-9). Dr. William Kenner, appointed by the trial

court, also testified that the Petitioner was competent, was not mentally retarded, and that he may

have a personality disorder. (Id., at Exhibit 12). At the penalty phase, the defense called Dr. Pat

Jaros, who testified that she worked with Dr. Anchor in evaluating the Petitioner, and found the

IQ score of 76 to be:

> . . . just about right.  I thought what came out on the I.Q. score was – there are
> some factors functioning here, perhaps some level of cultural deprivation or the
> people he grew up around perhaps had the same kind of grammar and syntax that
> he was exhibiting.  Perhaps some of those factors, just sub-cultural influences
> may have been operating.  But I thought the level that was obtained by the I.Q.
> test seemed pretty accurate.

(Id., at Exhibit 25, at 2310; Exhibit 26).  All of these experts interviewed and/or tested the

Petitioner before rendering their opinions.

 Dr. Gillian Blair tested the Petitioner in 1993 and prepared a report indicating that the

Petitioner scored a 73 IQ. (Id., at Exhibit 37).  Dr. Pamela Auble, who was hired by the defense

for the post conviction hearing in 1997, testified that she administered an extensive battery of

tests, and that the Petitioner scored a 76 IQ.  (Docket No. 106 (Addendum 30, Exhibits 33 and

34)). Dr. Auble also expressed concerns about the Petitioner's competence and possible brain

damage. (Id.)  Also in 1997, Dr. William Bernet testified that the Petitioner had a form of

amnesia, and called for additional testing to determine the cause. (Id., at Exhibits 39 and 40).

All of these experts interviewed and/or tested the Petitioner before rendering their opinions.

As stated above, Dr. Globus, Dr. Gur, Dr. Grant and Dr. van Eys rendered their opinions

of mental retardation some time later, in 2001, when the Petitioner was 45 years old. Based on

all the evidence set forth above, and the entire record, the Court specifically finds that although

the Petitioner may currently have a brain injury, the testimony of Petitioner's experts that the Petitioner's brain injury occurred prior to age 18 is not persuasive.

In summary, the Court concludes that the Petitioner has not shown significantly subaverage general intellectual functioning as evidenced by a functional IQ of 70 or below manifested by age 18. In reaching its decision, the Court makes no finding, and finds it unnecessary to make a finding, as to why the Petitioner's test scores have declined over time – whether due to motivation or brain injury.[8]

B. Deficits in adaptive behavior prior to age 18

The second criterion, considered in conjunction with the third, requires the Court to examine whether the Petitioner has shown: "deficits in adaptive behavior . . . manifested during the developmental period, or by eighteen (18) years of age." Tenn. Code Ann. § 39-13-203(a)(2), (3). The Tennessee Supreme Court has described this requirement to mean "the inability of an individual to behave so as to adapt to the surrounding circumstances." Coleman, 341 S.W.2d at 248 (quoting State v. Smith, 893 S.W.2d 908, 918 (Tenn. 1994)). The appeals court quoted a definition for the second criterion that has been applied by the Tennessee courts:

> The second part of the definition – adaptive functioning – refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, socio-cultural background, and community setting. As discussed, a mentally retarded person will have significant limitations in at least two of the following basic skills: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety. Influences on adaptive functioning may include the individual's education, motivation, personality characteristics, social and vocational opportunities, and the mental disorders and general medical conditions

---

[8]   The Court also makes no finding as to whether the Petitioner is competent to be executed under Ford v. Wainwright, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986).

that may coexist with Mental Retardation.

Black v. Bell, 664 F.3d at 98.

Dr. Grant testified that the tests he administered in 2001 showed the Petitioner had

deficits in adaptive behavior. (Docket No. 106 (Addendum 30, vol. 1, at 221-24)). Dr. Grant

based his determination that the Petitioner had adaptive deficits prior to age 18 on the following:

> Q.    . . . What can you show, from your evaluation, that establishes that Mr.
>        Black was in fact mentally retarded before the age 18?
>
> A.    I think there are several things: One, there are some findings from
>        Dr. Globus and Dr. Gur, were that, from Dr. Globus' testimony is
>        that there are some abnormalities in the brain that can best be
>        explained through the things that happened early in life. We have
>        the Coach's testimony that he had difficulty following plays, it
>        took more time. We also know that he repeated a grade. That the
>        Differential Aptitude Test score put him with the 1 percentile.
>        Although, we do have other scores that put him much higher, we
>        have testimony that stems from that regional school: It was a very
>        impoverished school; no one left the school that was at grade level;
>        that was also a school chosen for the Ford Grant. I think that's the
>        majority of what I can think of right now.

(Docket No. 106 (Addendum 30, vol. 2, at 285-86)). According to Dr. Grant, those with mental

retardation can acquire academic skills up to the sixth grade level by their late teens. (Id., at

287).[9] Because he had such strong family support, Dr. Grant testified, he was able to blend into

the population in his adult years. (Id.)

In terms of family support, Petitioner's sister, Ms. Corley, testified that she and the

Petitioner lived with their mother and three other sisters in the home of their grandparents, and

---

[9] Dr. Engum testified, on the other hand, that only "an exceptional mentally retarded individual" could perform at that level. (Docket No. 106 (Addendum 30, vol. 2, at 482)). Dr. Vaught testified: "Most of my mild mentally retarded patients function between the 3rd and 5th grades. Some, exceptional ones, achieve the 5th to 6th grade criteria." (Docket No. 106 (Addendum 30, vol. 3, at 573)).

24

that the Petitioner and his grandfather were the only males in the household:

> Q.   What type of chores did Byron have to do in the home to your observation?
>
> A.   Well, I know he didn't do any cooking, because that was, basically all the – my grandmother's job, and mine, my mother's. He didn't really have any particular chores that I remember him doing in particular.
>
> Q.   What about things like ironing his clothes or cleaning his clothes. Did he have any responsibilities there?
>
> A.   No.  That was all done by the ladies.
>
> Q.   What about things like washing the dishes?
>
> A.   No.
>
> Q.   And mowing lawns, did he ever do anything like that as a kid?
>
> A.   Huh-huh.  That was basically done by, any lawn mowing done was done by my grandfather.

(Id., at 78, 89-90). Ms. Corley was not asked whether the Petitioner had tried to cook, do laundry or mow the lawn, and found he was unable to do so.

Ms. Corley went on to state that the Petitioner took pride in his personal appearance as a child. (Id., at 92-93).  She recalled that the Petitioner could read and write, and "[a]s far as I remember, he wasn't a slow learner at that time." (Id., at 98-99).  On cross-examination, Ms. Corley said that neither she nor her family members noticed anything odd about the Petitioner during his childhood that made them think he may be retarded or mentally ill. (Id., at 88).

The Petitioner has also relied on the testimony of Al Dennis, who coached football at Hume-Fogg High School while the Petitioner attended there, regarding his memory of the Petitioner:

> Well, one thing I discovered, I remembered that when he, as a senior, he

25

weighed 150 pounds, and he was 5' 8 tall.  So he wasn't very big.  But he was an outstanding defensive player of all three years that he played for me.  His senior year, he was third on the team in tackles, and assists in tackles.

  Now, offense is a different story.  His sophomore year, he carried the ball one time.  His junior year, he carried it twice.  And the third year, we had an outstanding team we won the Division A, Class A, Championship.  And we won several games by a fairly good margin.  And we go to use back-up runners more than we normally did. And Byron ran the ball a number of times and scored several touchdowns. He's a good athlete. Good athlete.

(Docket No. 106 (Addendum 30, vol. 1, at 103-04)).  Mr. Dennis testified that the offense he ran was a lot more complicated than the defense, and "I think that's probably why Byron didn't play more than he did, because it was difficult for him to learn the plays." (Id., at 104-05).  Mr. Dennis also testified that he always remembers the Petitioner as smiling all the time, even in response to criticism. (Id., at 106).

On the other hand, Petitioner's brother, Thomas Black, testified that the Petitioner:

. . . was a very responsible child.  There was a lot of things about him, like he was always neat.  He always helped out.  He always had some little job or something like this when he was coming up.  A lot of that was influence from my grandfather.

(Docket No. 106 (Addendum 30 – Exhibit 20, at 2259)).  When asked why the Petitioner did not move out of the family home as an adult, Petitioner's sister, Arletta Delores Black, testified: "I'd say maybe he just didn't want the responsibility, I guess.  I really don't know." (Docket No. 106 (Addendum 30 – Exhibit 21, at 2265)).

Dr. Engum and Dr. Vaught considered this testimony and other information in reaching the opinion that the Petitioner did not show deficits in adaptive behavior prior to age 18.  Dr. Engum testified that he did not find evidence of such deficits:

I could not find that there were any indications that he was not functioning like a child within his culture, in his community.  He went to school.  Admittedly, he

26

was not the best student; I think I indicated that. But he did from, everything I can determine, graduate high school. He basically, his grades fluctuated. There was some D's. There were some C's. I can't speak to the quality of the school that he went to, but he did graduate. He played football. He appeared to be involved in those kinds of activities. I did not see any deficits or any mention of peer relationships, behavioral problems, problems attributable to Attention Deficit Disorder, problems attributable to any kind of learning disability.

Again, there doesn't appear to be any individualized assessment by school psychologists. There's no indication of any significant problems with juvenile authorities when he was growing up. There don't appear to be any unusual behavioral problems of any type, prior to age 18.

As I look through the testimony of the individuals during mitigation: Everybody said, as a matter of fact, teachers commented upon him as being one of her brighter children. Apparently, people in the community recognized him as somebody who is helpful. Always smiling. Always involved in things. There just did not appear to be any major deficits.

Frankly, I think it's conjecture to sit there and say, well, people compensated for him, because there's no evidence in the records that anybody was compensating for, or setting limitations on him, or restricting his activities, as you would with somebody who might be mentally retarded.

(Docket No. 106 (Addendum 30, vol. 2, at 378-80)).

Dr. Vaught testified that she applied the framework suggested by the AAMR ("American Association on Mental Retardation") in examining whether the Petitioner had deficits in adaptive behavior, which focuses on three general areas: Conceptual, Social and Practical. (Docket No. 106 (Addendum 30, vol. 3, at 549-50)). Dr. Vaught explained that:

Mr. Black's childhood history did not follow the pattern that I typically find for a person with mild mental retardation who has escaped diagnosis. His family was not raising the issue, and commented on him being normally developing, even motivated, industrious.

Then he was receiving care through Vanderbilt University Medical Center Pediatrics. They were treating him off-and-on for a skin condition. They didn't raise the question of the developmental impairment and they should, you know, would. Vanderbilt is very much in the know about those things. And that, also, got my attention that none of the physicians treating him raised that condition.

27

> And he did have contact with the medical establishment. A lot of impoverished families don't. And so I don't have that data point. But in his case, he had doctor-contact, and they didn't raise the issue.
>
> He proceeded through school, intermittent difficulty, graduated with a normal diploma. . . . He was not remembered by his family or his teachers as being slow.

(Id., at 571-72). Dr. Vaught also pointed out that the Petitioner experienced the stress of a football injury, the birth of his first child and the death of one of his teachers while in high school, and he was still able to graduate. (Id., at 573-74). Dr. Vaught testified that "I have very rarely, if ever, seen a person with mild mental retardation make it through high school with no assistance like that, and they've managed to get a regular diploma." (Id., at 574). Dr. Vaught testified that while the DAT ("Differential Aptitude Test") scores, referenced by Dr. Grant, were low, they were not at the level typically associated with mental retardation. (Id., vol. 3, at 573-75).

The Petitioner attacks the validity of the findings made by Dr. Engum and Dr. Vaught based on their failure to interview and test the Petitioner. Dr. Engum explained that he decided not to conduct further testing because he thought the Petitioner was probably "test-wise" and "test-weary," and because the real inquiry is whether he met the statutory criteria at age 18, not at his current age. (Docket No. 106 (Addendum 30, vol. 2, at 367)). Dr. Engum further explained: "So, again, to do testing now is, in my mind, almost irrelevant and in (sic) somewhat misleading, because of, potentially, other intervening variables." (Id., at 510). Dr. Vaught testified that she did not interview the Petitioner primarily because "I didn't feel like I would add anything, because I already had, in my review of the records, determined that his adaptive functioning was higher than to be expected for a person with mental retardation. And that, I

28

could not find any evidence that the problems onset before age 18." (Id., at 535).[10]

The Court finds that the opinions of Dr. Engum and Dr. Vaught are not undermined by their failure to interview and/or test the Petitioner at age 45 regarding whether he was intellectually disabled prior to age 18. As discussed above, the record indicates that the Petitioner was interviewed and/or tested by at least eight different mental health experts prior to the latest round of testing in 2001.

Both sides point to Petitioner's life after age 18 to support their argument that the Petitioner did or did not have deficits in adaptive behavior. The Respondent refers to evidence that includes indications that the Petitioner obtained a drivers' license, bought and maintained a car, held a job for nine years, and made intelligent statements to police during questioning. The evidence cited by Petitioner includes testimony that he always lived with his mother, did not pay child support, and performed menial tasks at his job. Having fully reviewed this and all the evidence in the record, the Court maintains its opinion that the Petitioner has not shown deficits in adaptive behavior prior to age 18.

In considering whether the record establishes deficits in adaptive behavior, the Sixth Circuit directed this Court to "'focus on Defendant's deficits, not his abilities,'" 664 F.3d at 99 (quoting United States v. Lewis, No. 1:08 CR 404, 2010 WL 5418901, at *30 (N.D. Ohio Dec. 23, 2010)), and to "look at his weaknesses instead of at his strengths." Id. A full, independent review of the record persuades this Court that the Petitioner has not shown weaknesses or

_____

[10] The Court notes Dr. Vaught's testimony that "I cautioned this man [the State's attorney] when he came to me: If I could, you know, find that this man is mentally retarded and keep him from being executed, I'm going to do it, you just need to understand that." (Id., at 602). Consequently, Dr. Vaught gave the Petitioner "the benefit of the doubt" that his current testing showed mental retardation. (Id., at 599-602; 539-44).

29

deficits in his adaptive behavior prior to age 18 within the meaning of the statute.

The Sixth Circuit also directed the Court to consider that deficits in adaptive functioning can be caused by both mental retardation and mental illness: "mental retardation and any number of other factors may coexist as comorbid causes of a defendant's deficient adaptive functioning." 664 F.3d at 99-100.[11] Because the Court does not find any deficits in adaptive function within the meaning of the statute prior to age 18, it is unnecessary to determine whether such deficits were caused by mental retardation, mental illness, or both.

In conclusion, the Court has fully considered the evidence in the state court record in applying the criteria set forth in Tenn. Code Ann. § 39-13-203, and concludes that the Petitioner has not met his burden of proving intellectual disability by a preponderance of the evidence.

## V.  Conclusion

For the reasons set forth above, the Court concludes that the Petitioner has not established that he is intellectually disabled by a preponderance of the evidence.

The Court concludes that Petitioner has made a substantial showing of the denial of a constitutional right as to his mental retardation claim, and reasonable jurists could find the Court's assessment of the constitutional claim debatable.  See, e.g., Castro v. United States, 310 F.3d 900 (6th Cir. 2002).  Accordingly, the Court will issue a certificate of appealability on

---

[11] Dr. Vaught's testimony that mental retardation has nothing to do with mental illness, read in context, relates to her criticism of Dr. Grant's statement that mental retardation is a form of mental illness. (Docket No. 106 (Addendum 30, vol. 3, at 579-80)). In making this statement, Dr. Vaught was not addressing the cause of any deficits in Petitioner's adaptive behavior because she did not find any deficits within the meaning of the statute prior to age 18. (Id., at 583). Throughout her testimony, Dr. Vaught explained that the bad choices made by the Petitioner later in life, *though they did not indicate deficits during the developmental period*, may have had to do with personality issues.

30

Petitioner's mental retardation claim under <u>Atkins v. Virginia</u>, 536 U.S. 304 (2002).

    It is so ORDERED.


_____
TODD J. CAMPBELL
UNITED STATES DISTRICT JUDGE